IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,　　　　　　　No. 3:21-cr-00014-HZ

　　　　　Plaintiff,　　　　　　　　　　　　　　OPINION & ORDER

　　v.

ARMANDO MARTINEZ CANCHOLA,

　　　　　Defendant.

Scott Asphaug
Acting United States Attorney
District of Oregon
Paul T. Maloney
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204

　　　Attorneys for Plaintiff

Ernest Warren, Jr.
Warren & Sugarman
838 SW First Avenue, Suite 500
Portland, OR 97204

　　　Attorney for Defendant

1 – OPINION & ORDER

HERNÁNDEZ, District Judge:

Defendant Armando Martinez Canchola moves to suppress evidence seized during a search of a hotel room, arguing that the search violates the Fourth Amendment of the United States Constitution. For the reasons below, the Court denies Defendant's motion.

## BACKGROUND

### I. Investigation

Special Agent Dixon is a special agent with the Drug Enforcement Administration. As part of a larger investigation, Special Agent Dixon and his team identified and arrested an individual—referred to as "CD1"—involved in drug trafficking. Through interviewing CD1, they obtained information about Defendants McLaughlin and Canchola. Specifically, CD1 stated that Defendants were involved in trafficking heroin and methamphetamine. Defendant Canchola was a truck driver who would transport drugs in both his truck and passenger vehicles from California to Defendant McLaughlin in the Portland area. They would meet at hotels to conduct their drug transactions. At one transaction, Defendant Canchola was with a woman who had a firearm. CD1 also provided officers with phone numbers for Defendants Canchola and McLaughlin.

Special Agent Dixon was able to corroborate CD1's statements. They confirmed that Defendant Canchola is a commercial truck driver based on his California driver's license designation. Special Agent Dixon was also able to confirm that the amount of drugs and the amount of money exchanged as described by CD1 were consistent with the prices at the time of the transaction. The phone number identified by CD1 was used by Defendant Canchola on financial records. CD1's statements that Defendant McLaughlin was trafficking drugs out of hotels was consistent with information from CD2, a different informant who conducted a

controlled purchase of methamphetamine from Defendant McLaughlin at a hotel. CD2 arranged the transaction over communications with the cell phone number that was identified by CD1. CD2 also observed Defendant McLaughlin's vehicle at the time—a BMW X5.

In addition, Special Agent Dixon obtained call detail records for the phones that were identified as belonging to Defendants Canchola and McLaughlin. The records showed—consistent with CD1's statements—that both co-defendants were in contact with each other. Basic location data from the records also revealed that Defendant Canchola had been in both Oregon and California and that both men were in contact with one another when Defendant Canchola was travelling to and in Oregon.

After obtaining all this information, Special Agent Dixon applied for and was granted a search warrant for geolocation data for the cell phones belonging to Defendants Canchola and McLaughlin. When he received the warrant on November 19, 2020, Defendant McLaughlin's phone was no longer in service. But on November 20, 2020, geolocation information showed Defendant Canchola's phone moving from Sacramento, California, into southern Oregon, and then travelling further north toward Portland. On November 21, 2020, they ultimately located the phone in Tigard, Oregon, in an area off of Highway 99 that included hotels.

## II.     Police Search

Officers arrived at the Best Western hotel in Tigard and observed Defendant McLaughlin's BMW X5 in the parking lot, the same car which was identified by CD2 when they conducted the controlled purchase of methamphetamine. They also noticed that there was a car with a California license plate in the lot. Some investigators maintained exterior surveillance while Special Agent Dixon and others went into the hotel lobby to address the clerk. After identifying himself as law enforcement to the hotel clerk, Special Agent Dixon informed the

clerk that he believed there was a drug transaction taking place in the hotel and asked to review the guest roster to identify any known suspects.

When reviewing the guest roster, Special Agent Dixon found the name of Defendant Becky Saelee and asked to see any records associated with her reservation. Defendant Saelee as well as Defendant Canchola had completed a COVID-19 screening form that was required by the hotel for all guests. Special Agent Dixon also learned that they were staying in room 330.

An agent conducting surveillance on room 330 notified Special Agent Dixon that a woman—who would later be identified as Defendant Taryn Coleman—had left the hotel room. The agents returned to the hotel lobby in protective vests labeled "DEA" or "Police" and detained Defendant Coleman in the lobby. She reported to agents that she had left room 300, which was inconsistent with the observation of the officer maintaining surveillance of room 330. Agents confiscated her cell phone and asked if there were any other people in the room she had left. Defendant Coleman confirmed that there were three other people.

One agent remained with Defendant Coleman in the lobby while Special Agent Dixon, a task force officer, and an agent went upstairs to room 330. Special Agent Dixon obtained a key to the hotel room from the clerk. The agents had planned to conduct a "knock-and-talk." In light of his knowledge that someone had already left the room, Special Agent Dixon thought the best approach was to knock on the door and encounter the people inside the room because these transactions can move and change quickly. In his experience, drug trafficking transactions are typically very fast. Drugs can be destroyed, consumed, and hidden. They are inherently dangerous and can involve firearms. The drug transaction here also presented a danger to the other occupants of the hotel. And the other evidence of the crimes at issue—including the actual meeting between traffickers and cell phone data—are fleeting or can be easily destroyed.

Special Agent Dixon was armed and had his handgun at the "low ready" as he approached the door. He knocked on the door and did not hear a response. When he knocked a second time, he heard a woman ask "who is it?" One of the agents responded "Chris." He then heard multiple voices having a discussion. He also heard movement and what sounded like shuffling, walking, or moving feet. According to Special Agent Dixon, these sounds could mean a variety of things, including moving objects like furniture or clothes, trying to conceal things, or moving drugs to a place where they can be easily destroyed.

Special Agent Dixon then knocked on the door much louder and in a commanding voice identified himself as "Police, DEA." The door then opened a few inches, and Special Agent Dixon saw Defendant Saelee. A latch on the door kept it from opening all the way. Special Agent Dixon then told Defendant Saelee that he needed her to open the door. But she did not say anything and closed the door. Special Agent Dixon then heard additional shuffling, movement, and whispering. He pounded on the door again and demanded that it be opened. He testified that he was concerned about both the destruction of evidence and the safety of officers and hotel occupants. Special Agent Dixon then attempted to open the door with a hotel key that he had obtained earlier from the clerk. According to his testimony, the light flashed green but the door would not open. Agents continued knocking until Defendant Saelee opened the door again.

Once the door opened, Defendant Saelee put her hands up and backed away into the small closet next to the door. Special Agent Dixon saw Defendants Canchola and McLaughlin standing in the doorway of the bathroom inside the hotel room. Special Agent Dixon instructed them to show their hands and directed them out of the room into the hallway. Special Agent Dixon also saw what he believed to be packages of methamphetamine and stacks of currency on the coffee table. Once all three individuals were secured by his partners, Special Agent Dixon

entered the room and conducted a safety sweep for other people or obvious threats. After completing the safety sweep, Special Agent Dixon left the room and closed the door behind him. Defendants Saelee, Canchola, and McLaughlin were then escorted to the hotel's breakfast nook, where post-*Miranda* interviews were conducted. Special Agent Dixon returned to his office to draft an affidavit for a search warrant to search the hotel room and vehicles in the parking lot.

### III.     Procedural History

On November 22, 2020, a magistrate judge signed a criminal complaint and issued an arrest warrant for Defendant Canchola. On January 21, 2021, the grand jury returned an indictment charging Defendant Canchola with Possession with Intent to Distribute Heroin under 21 U.S.C. § 841(a)(1), (b)(1)(A)(i); Possession with Intent to Distribute Methamphetamine under 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii); and Maintaining a Drug Involved Premises under 21 U.S.C. § 856(a). Indictment, ECF 58. Defendant now moves to suppress the evidence seized during the November 21, 2020 search of the hotel room, arguing that the warrantless search violated the Fourth Amendment.

### DISCUSSION

Defendant argues that Special Agent Dixon's search of the hotel room without a warrant violated the Fourth Amendment.[1] Def. Mot. 5. The Government responds by arguing that the

---

[1] Defendant generally asserts in his motion that "[n]either [S]pecial Agent Dixon, nor his associates, had the requisite probable cause to search Mr. Conchola's room." Def. Mot. 5. Defendant appears to primarily take issue with Special Agent Dixon's statement in his affidavit that Coleman's departure from the hotel room with drugs was one of the reasons officers believed a drug transaction was taking place in the hotel room. Dixon Aff. ¶ 17. In particular, Defendant emphasizes that Officers had not yet discovered the drugs on Defendant Coleman at the time they undertook the search. *Id.* Defendant, however, does not challenge the other information obtained by officers and cited by Special Agent Dixon as the impetus for their search, and he appears to concede in his reply that at the time of the search the officers could have obtained a warrant. *See* Def. Reply 5.

exigency of the situation justified a warrantless search in this case. Gov't Resp. 5. The Court agrees with the Government.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. "The Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms." *United States v. Cormier*, 220 F.3d 1103, 1108–09 (9th Cir. 2000).

"'[S]earches and seizures inside a home without a warrant are presumptively unreasonable.'" *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). But the Court has "also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness." *Id.* (internal quotations and citation omitted). The warrant requirement is therefore "subject to certain reasonable exceptions." *Id.* In determining whether a law enforcement officer's actions were "reasonable," courts take an objective approach, asking only whether "the circumstances, viewed objectively, justify the action." *Id.* at 461 (internal quotations and citation omitted)

One such exception is the "exigent circumstances" exception, where "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). Relevant to this case, "'[e]xigent circumstances are present when a reasonable person [would] believe that entry . . . was necessary to prevent physical harm to the officers or other

persons[.]" *Bailey v. Newland*, 263 F.3d 102 2, 1033 (9th Cir. 2001) (quoting *United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993)). And "the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search." *King*, 563 U.S. at 460 (quotations omitted); *United States v. Iwai*, 930 F.3d 1141, 1144 (9th Cir. 2019) ("Preventing the imminent destruction of evidence is one such exigency, and exists when officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that evidence or contraband will imminently be destroyed." (quotations and brackets omitted)). That the police created the exigency is immaterial so long as "the conduct of the police preceding the exigency is reasonable" and did not involve "engaging or threatening to engage in conduct that violates the Fourth Amendment." *King*, 563 U.S. at 461. "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, [courts] look to the totality of the circumstances." *Missouri v. McNeeley*, 569 U.S. 141, 149 (2013). "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002).

Here, the Court finds exigent circumstances made the warrantless search of the hotel room objectively reasonable. Officers needed to prevent both physical harm to the officers or other persons and the imminent destruction of evidence. Based on the information from CD1 and CD2 as well as geolocation data, officers had probable cause to believe that there was evidence of a crime in the hotel room. They could have obtained a search warrant. Instead, for a variety of reasons, the officers knocked on the door, eventually identifying themselves as police. As Special Agent Dixon testified, drug transactions are inherently dangerous and happen quickly. Drugs can also be destroyed in a hotel room. In this case, officers heard whispering and shuffling after Special Agent Dixon knocked on the door and announced that they were police, which

8 – OPINION & ORDER

could indicate—among other things—that the occupants were moving to destroy or hide evidence. Moreover, based on information from CD1, it was possible that this drug transaction involved a firearm, putting the safety of both the officers and other hotel guests at risk. At this point, there were exigent circumstances justifying the warrantless search of the hotel room. Thus, looking at the totality of the circumstances, the Court finds that the situation made the needs of law enforcement so compelling that the warrantless search was objectively reasonable. *See Iwai*, 930 F.3d at 1145 (finding "[e]xigency arose at the time [the agent] heard the suspicous sounds" because, in addition to his own experience as a narcotics officer, the agent had discovered six pounds of methamphetamine in a package addressed to the defendant the day before, the agents knew the defendant was in his home, and a beeper signaled that the package with the drugs had been opened); *U.S. v. Alfonso*, 759 F.2d 728, 742–43 (9th Cir. 1985) (finding exigent circumstances where police heard scuffling noises from a hotel bathroom because "[i]t was reasonable to believe that concealed presences might pose a danger, or that an unidentified person might be able to destroy evidence.").

In arguing the officers violated the Fourth Amendment, Defendant emphasizes that officers created the exigency and that they could have sought a warrant but chose not to. Def. Reply. 5. But the Supreme Court has been clear that under circumstances like these "[f]aulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *King,* 563 U.S. at 467. Further, as the Court stated in *Kentucky v. King*, it is immaterial that the police created the exigency so long as their conduct proceeding the exigency is objectively reasonable. *Id.* at 461. Here, there is no evidence that police conduct *prior* to the exigency was unreasonable. They did not violate or threaten to violate the Fourth Amendment. Rather, they approached the door in

tactical gear with their weapons in the "low ready" position, they knocked on the door a few times, and identified themselves as police when the suspicious noises were heard. Accordingly, the Court denies the motion to suppress.

## CONCLUSION

The Court DENIES Defendant Canchola's Motion to Suppress [31].

IT IS SO ORDERED.

DATED:＿＿November 29, 2021＿＿.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
MARCO A. HERNÁNDEZ
United States District Judge